**Affirmed and Memorandum Opinion filed February 27, 2024.**



**In The**

# Fourteenth Court of Appeals

---

**NO. 14-22-00742-CV**

---

**IN RE THE COMMITMENT OF R.E.A., Appellant**

---

**On Appeal from the 56th District Court**
**Galveston County, Texas**
**Trial Court Cause No. 21-CV-2124**

---

# M E M O R A N D U M   O P I N I O N

Robert Edmond Alexander appeals his civil commitment as a sexually violent predator, arguing that the unreliability of the State's expert-opinion evidence renders the evidence legally insufficient, or alternatively, the evidence is legally or factually insufficient to support the verdict against him even if the expert-opinion evidence was properly admitted. We conclude that the trial court did not abuse its discretion in admitting the expert testimony and that the evidence supports the judgment. Thus, we affirm.

# I. THE TEXAS CIVIL COMMITMENT OF SEXUALLY VIOLENT PREDATORS ACT

The Texas Legislature found that "a small but extremely dangerous group of sexually violent predators exists and that those predators have a behavioral abnormality that is not amenable to traditional mental illness treatment modalities and that makes the predators likely to engage in repeated predatory actions of sexual violence." TEX. HEALTH & SAFETY CODE § 841.001. The legislature further found that "a civil commitment procedure for the long-term supervision and treatment of sexually violent predators is necessary and in the interest of the state." *Id*. The legislature accordingly enacted the Texas Civil Commitment of Sexually Violent Predators Act, codified as chapter 841 of the Texas Health & Safety Code.[1]

A person must be administratively determined to be a sexually violent predator before the State files a civil-commitment suit. *Id*. §§ 841.021–.023; *In re Commitment of Bohannan*, 388 S.W.3d 296, 298 (Tex. 2012). When the administrative determination is made, notice is given to an attorney representing the State. TEX. HEALTH & SAFETY CODE § 841.023. Once the person is referred to the State, an attorney representing the State may file a civil commitment proceeding in the court of conviction for the person's most recent sexually violent offense. *Id*. § 841.041(a). If a judge or jury likewise determines that the person is a sexually violent predator, the trial court must commit the person for treatment and supervision to begin on the date of release from prison and to continue "until the person's behavioral abnormality has changed to the extent that the person is no longer likely to engage in a predatory act of sexual violence." *See id*. § 841.081(a).

---

[1] *See* TEX. HEALTH & SAFETY CODE §§ 841.001–.209.

A person is a sexually violent predator if the person (1) is a repeat sexually violent offender,[2] and (2) suffers from a behavioral abnormality that makes the person likely to engage in a predatory act[3] of sexual violence. *Id*. § 841.003(a). As to the first prong, Alexander has been twice convicted of sexually assaulting a child under the age of fourteen. Due to the victims' ages, the offenses constituted aggravated sexual assaults, which fall within the definition of "sexually violent offenses."[4] Thus, Alexander is a repeat sexually violent offender as a matter of law. The trial in this case accordingly focused on the second prong, that is, the requirement of a behavioral abnormality.

"Behavioral abnormality" is statutorily defined as "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* § 841.002(2). A person is "predisposed" to commit such an offense (or stated differently, is "likely" to do so) if there is if an "increased risk" that that person will commit a predatory act of sexual violence. *Bohannan*, 388 S.W.3d at 303. The case before us turns on the reliability and sufficiency of the evidence that Alexander presents such a heightened risk.

## II. BACKGROUND

Alexander was sentenced in 2001 to two concurrent thirty-year sentences for the aggravated sexual assault of two children. After serving more than twenty-one

---

[2] "Sexually violent offense" means, among other things, (1) an offense under Texas Penal Code sections 21.02 (Continuous Sexual Abuse of Young Child or Disabled Individual), 21.11(a)(1) (Indecency with a child), 22.011 (Sexual Assault), or 22.021 (Aggravated Sexual Assault); and (2) an offense under prior state law that contains elements substantially similar to the elements of an offense listed above. *See id*. § 841.002(8)(A), (F).

[3] "'Predatory act' means an act directed toward individuals, including family members, for the primary purpose of victimization." *Id*. § 841.002(5).

[4] *See* TEX. PENAL CODE § 22.021; TEX. HEALTH & SAFETY CODE § 841.002(8)(A).

years of those sentences, Alexander entered the Texas Department of Criminal Justice's Sex Offender Treatment Program, which could result in his early release on parole. Alexander was administratively determined to be a sexually violent predator, and the State petitioned for his civil commitment. A jury likewise found that Alexander is a sexually violent predator. The trial court rendered a final judgment to that effect and ordered that, upon Alexander's release from prison, he be civilly committed for treatment until his behavioral abnormality changes to the extent that he is no longer likely to engage in a predatory act of sexual violence.

At trial, and over Alexander's objection, Dr. Darrell Turner testified that Alexander has the requisite behavioral abnormality. Alexander's appeal turns on questions of whether the trial court should have excluded Dr. Turner's expert opinion as unreliable and whether the evidence, with or without Dr. Turner's testimony, is legally and factually sufficient to support the element of a behavioral abnormality.

## A.    Alexander's Testimony

Alexander denied any criminal history as a juvenile, though he admits that he stole from other students' lockers almost daily when he was in junior high or when he was fourteen or fifteen. He committed his first sex offense when he was nineteen or twenty. In discussing those offenses, we refer to the victims and their family members using pseudonyms.

### 1.    David (1988)

Alexander's first offense occurred when he, his six-year-old cousin David, and David's sister were all at their grandparents' house in July 1988. David asked for a drink of water, and Alexander led him into the kitchen. After Alexander gave David a drink, Alexander put his erect penis in David's mouth. That same day,

Alexander took David to a camper in their grandparents' front yard, where Alexander performed oral sex on David. Alexander says that he was not drunk when he committed these acts.

David did not make an outcry for several years. When he did, Alexander denied the accusation. Believing Alexander's denials, Alexander's family distanced themselves from David's family.

### 2. *Karl (1995)*

Alexander dated Whitney, with whom he had two children. Whitney also had a son, Karl, from a prior relationship. In 1995, while Alexander, Whitney, and Karl were visiting Alexander's aunt, Alexander asked Karl to undress. Karl did, and Alexander put Karl's penis in his mouth. Karl was six years old at the time. Alexander denies that he was sexually aroused when he put Karl's penis in his mouth or that he had been using drugs or alcohol.

Alexander was not charged with this offense, though it seems to have been reported to Child Protective Services at an indeterminate time. While later participating in the prison's Sex Offender Treatment Program, Alexander admitted to the offense. When testifying about this admission, Alexander stated, "I have no reason to hide things and as of [Karl] passing away, I kind of feel responsible for that."

### 3. *Nancy (2000)*

In April 1996, Alexander was arrested for his aggravated sexual assault of David, and he eventually received ten years' deferred adjudication for that offense. During the deferral, Alexander was required to stay away from children, register as a sex offender, abstain from alcohol and illegal drugs, report regularly to his

probation officer, participate in a sex-offender treatment program, and report any change of address, re-registering as a sex offender in the new location.

Alexander participated weekly in a sex-offender treatment program and registered as a sex offender in Santa Fe, where he had previously lived with his father. In reality, however, Alexander lived in Hitchcock, Texas, with his girlfriend Deborah, Deborah's mother, and Deborah's three daughters. He did not register as a sex offender in Hitchcock or tell his probation officer his true address. He instead went to his father's house every morning and afternoon in case his probation officer dropped in, returning home to Hitchcock every night. Alexander reports that he used cocaine and smoked marijuana daily during this period.

In November 2000, Alexander sexually assaulted Deborah's ten-year-old daughter Nancy at the home they shared. Alexander said that he had already smoked about five marijuana cigarettes that day and was relaxing on his bed watching television when, as he later testified, Nancy "walked in and she laid down beside me, put her head on my chest." Alexander stated that he wrapped his arms around Nancy and put his hand down her panties, fondling her and digitally penetrating her vagina. He states that he afterwards was sexually aroused and had an erection.

Alexander was arrested for this offense and pleaded guilty. In March 2001, he was sentenced to thirty years' imprisonment for this offense. At the same time, his deferred adjudication was revoked and he was sentenced to thirty years' confinement for the offense against David.

### 4. *Present Time*

At the time of trial, Alexander was 54 years old and had been in prison for over twenty-one years. During that time, he has abstained from drugs and alcohol, though he has had access to them. His only disciplinary records are for minor

infractions, such as swearing at a guard. He takes medication for hypertension, arthritis, a thyroid problem, and a mood disorder, but he is otherwise in good health and plans to work when he is released into the community. He stated that he would probably work as a warehouseman because he likes driving a forklift, but he would like to attend culinary school as well.

Alexander related that when he was imprisoned, he "went to" Catholic, Protestant, "Masoniac,"[5] and Judaism, before obtaining and reading his own Bible. He stated that he is now a follower of Jesus Christ and believes that he must tell the truth. He currently is engaged to a woman he met through another inmate, and he said that she knows what he was convicted for, but that he has not told her any details. He stated that his fiancée plans to take a class to learn how to act as his chaperone. His fiancée is 75 and has two grandchildren under the age of 15 who live "about five minutes down the road from her."

Alexander admitted that he sometimes has had trouble controlling his anger, both before and after he was imprisoned. He admitted that during an argument with his then-wife, he put his hand through a glass window "[t]o avoid hitting her."

Alexander denied that he has ever been addicted to cocaine or marijuana, or that there is any need for him to participate in substance-abuse programs when he is released. He expressed remorse for his offenses, and stated that when he is released, he plans to start a street ministry with his former cellmate. When asked if he would possibly be around children when pursuing a street ministry, he answered, "I can't say that. I'm not going to search out for children. If they're on the streets, then yes." He also denied that he is or ever was sexually attracted to children, even at the time of his offenses, adding, "I don't seek children out. That's not what I did."

---

[5] Alexander might have meant "masonic" or perhaps "messianic."

**B.      Dr. Turner's Testimony**

Dr. Turner is a doctor of clinical and forensic psychology licensed in both Texas and Louisiana. He researches, speaks, and writes about recidivism by sex offenders, and he has given professional presentations concerning risk assessment of such offenders. He has performed 350–400 risk assessments. He testified that forensic psychology is a legitimate field, and that he relied on the principles of forensic psychology in evaluating Alexander. Dr. Turner stated that his testimony is within the scope of that field, and that his methodology is consistent with accepted standards of forensic psychology. He testified that his expert opinion is based on factors shown by empirically based research to make a sex offender more likely or less likely to commit additional sex offenses.

Dr. Turner explained that when he accepts a risk-assessment case, he first receives a set of records that he uses to create a profile of the offender before interviewing him. These include court records, records of police investigations, witness statements, depositions, and information about how the offender has adjusted in prison. The records may also include mail, certificates, and medical records. After reviewing the records he received in this case, Dr. Turner interviewed Alexander for about three hours. Dr. Turner later reviewed his own deposition, Alexander's deposition, additional notes about the investigation into the offenses, some medical records, and records from Child Protective Services about Alexander's offense against Karl. In expressing his expert opinion at trial, Dr. Turner took into account all of this material, as well as Alexander's trial testimony.

Dr. Turner's testimony conflicted with Alexander's in several respects. Most notably, Dr. Turner testified that when he interviewed Alexander, Alexander disclosed that he had a lifelong fantasy, albeit one that lessened over time, of raising a child as a sex slave, and when that child grew up, beginning again with another

child. Alexander denied that he ever had such a fantasy or that he had said such a thing to Dr. Turner. In addition, Alexander testified that when he sexually assaulted Nancy, she had come into his bedroom and put her head on his chest, but Alexander stated that Nancy "did nothing wrong," and specifically, "[s]he didn't come on to me." Dr. Turner, however, interpreted Alexander's testimony, or perhaps his demeanor while testifying, to suggest that Alexander believes Nancy initiated sex. In accordance with the standard of review, we assume that the jury assessed the witnesses' credibility and resolved conflicts in the evidence and in a manner that supports the verdict.

Dr. Turner also described his diagnoses, the standardized assessment tools he used, the risk factors and protective factors that would make Alexander more or less likely to reoffend, and his conclusion concerning the existence of a behavioral abnormality.

### 1.   Diagnoses

Dr. Turner testified that the authoritative reference work in his field is the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, and that psychologists "always" rely upon "the DSM-5." Applying the DSM-5's criteria, Dr. Turner diagnosed Alexander with the following conditions:

- *Pedophilic disorder, nonexclusive type*. This means that Alexander is attracted to prepubescent children, and the attraction is nonexclusive in that Alexander also is attracted to adults.

- *Unspecified personality disorder with antisocial features*. Dr. Turner explained that antisocial traits are associated with a willingness to break rules. Dr. Turner noted that there is a great deal of overlap between antisocial and psychopathic traits, the difference being that "antisocial" is the term used in psychology while "psychopathic" is a legal term.

- *Impulse control disorder*. Dr. Turner stated that he was not the first person to diagnose Alexander with this disorder. Dr. Turner explained that all people are impulsive at times, but someone with impulse control disorder "is way on the other end of the spectrum and this really kind of describes how they act or who they are." Dr. Turner stated that this disorder is distinct from Alexander's antisocial personality traits in that impulse control disorder "affects all aspects of his life."

- *Alcohol abuse disorder, marijuana abuse disorder, and cocaine abuse disorder*. Dr. Turner stated that Alexander has all of these conditions, but all three are in full, sustained remission.

Dr. Turner also made a provisional diagnosis of sexual sadism. Dr. Turner called this a "provisional" diagnosis because he felt there was some evidence of the condition, but not enough to warrant a formal diagnosis.

Finally, Dr. Turner stated that Alexander takes a combination of drugs used to treat depression.

### 2. Assessment Tools

Dr. Turner also used two standardized assessment tools: the Psychopathy Checklist Revised (PCL-R) and the "Static-99R," an actuarial test used to measure "static"—that is, persistent—characteristics that research has shown to be correlated with an increased risk that a convicted sex offender will later be convicted or arrested for additional sex offenses.

The PCL-R does not test for the existence of a "behavioral abnormality" as that term is used in chapter 841, nor was it designed to determine the risk that a sex offender will offend again. The test instead compares the extent of the test-taker's psychopathic traits with those of the prison population in general. Results are stated in a range of 0–40, and a typical adult male with no criminal history would score in the range of 5–8. A score of 25–30 would show a high degree of psychopathic traits, and a score above 30 would mean a severe degree of such traits. Dr. Turner stated

that the scores of pedophilic offenders do not show much elevation. He gave Alexander a score of 16, which is two or three times that of a man without a criminal history, but lower than most prison inmates. Dr. Turner considers a score of 16 to represent a moderate degree of psychopathic or antisocial traits.

The Static-99R yields a score that corresponds with the percentage of sex offenders who will be convicted of another such offense. Dr. Turner stated that there is no more accurate tool to measure a sex offender's chance of reconviction and the majority of his colleagues use it. Nevertheless, Dr. Turner did not score Alexander's results, because he was not assessing the likelihood that Alexander would be convicted of another sex offense but was instead evaluating whether Alexander has a behavioral abnormality. Dr. Turner stated that he considered all of the factors listed in the Static-99R but stopped short of scoring it.

### 3.   *Risk Factors*

In determining whether Alexander has the requisite behavioral abnormality, Dr. Turner identified a number of risk factors. According to Dr. Turner, the most important of these were Alexander's combined diagnoses of pedophilic disorder, unspecified personality disorder with antisocial features, and impulse control disorder. Dr. Turner explained that Alexander's persistent sexual attraction to prepubescent children, coupled with his antisocial willingness to break rules, elevates his risk of reoffending. Dr. Turner stated that Alexander's impulse control disorder makes it even more likely that Alexander would impulsively act on strong feelings, which elevates Alexander's risk of reoffending still further.

In addition to those diagnoses, Dr. Turner concluded that Alexander manifested the following risk factors, and Dr. Turner stated his reasons for considering these as risk factors:

- *Depression*. Dr. Turner stated that mental-health problems increase the risk of reoffending, and Alexander is taking medication for depression.

- *A male victim*. Research shows that males who commit sex offenses against males are more likely to reoffend.

- *A second male victim*. According to Dr. Turner, multiple male victims across time is evidence of a behavioral abnormality.

- *A female victim*. Dr. Turner testified that this increased Alexander's dangerousness because his willingness to offend against both males and females increases the pool of potential victims.

- *Minimizing the full range of time over which Alexander committed offenses*. In describing the material on which he based his expert opinion, Dr. Turner testified that there are records indicating that Alexander committed sexual offenses against David over a period of time when David was between the ages of four and six. From this, Dr. Turner concluded that Alexander sexually assaulted David multiple times over a two-year period. Dr. Turner stated that this behavior called into question Alexander's credibility in answering other questions.

- *Persistence after punishment*. Dr. Turner pointed out that Alexander committed the offense against Nancy after being caught and placed on deferred adjudication for his offense against David. Dr. Turner stated that persisting in offending after being punished goes to the "core" of a person's likelihood of reoffending.

- *Intoxication during the offense*. Alexander testified that he was intoxicated when he committed the offense against Nancy, and Dr. Turner stated that research shows offenders are more likely to reoffend if they previously committed a sex offense while under the influence of an intoxicating substance.

- *"Grooming" behavior*. Dr. Turner stated that there is some evidence that Alexander told Nancy she would get in trouble if she disclosed what he had done. Dr. Turner stated that this is "grooming" behavior.

- *Presence of others in the house during the offenses*. Alexander committed sex offenses in houses in which other people were present. Dr. Turner described this as "pretty brazen."

- *Failure to abide by the conditions of deferred adjudication*. Dr. Turner noted that Alexander failed to register as a sex offender in the past and put himself in a position to reoffend by living with children.

- *Familiarity with victims*. Dr. Turner pointed out that none of Alexander's victims were strangers. Dr. Turner stated that those who commit sex offenses only against familiar people have an increased risk of reoffending.

- *Recidivism while in treatment*. Alexander committed the offense against Nancy while regularly attending a sex-offender treatment program. This, too, increases Alexander's risk for reoffending.

- *Lack of awareness of behaviors facilitating recidivism*. Dr. Turner emphasized that Alexander's street-ministry plan is not a plan to stay away from children but is instead a plan to be around children in a context in which Alexander "may get a little bit more trust from parents than someone else would." Dr. Turner stated that when he pointed this out to Alexander, Alexander responded that he would just "stick to the adults," indicating that Alexander has poor insight into his own offending behavior and lacks self-knowledge.

Dr. Turner stated that the risk factors he described are based on research and are relied upon by other experts when performing risk assessments of sex offenders.

### 4. Protective Factors

Dr. Turner identified the following as protective factors:

- Alexander does not have bipolar disorder.

- His relatively clean disciplinary records from prison show institutional adjustment.

- At the time of trial, Alexander was 54, and sexual desires, including pedophilic ones, weaken with age. Antisocial personality traits likewise become less intense over time.

- Alexander had multiple prior marriages and lived with someone for longer than two years.

- Although Alexander has some access to drugs and alcohol in prison, he has abstained.

- Alexander doesn't speak about his victims in ways that denigrate them.

- He has a fiancée waiting for him when he is released.

- Alexander is currently participating in a treatment program for sex offenders, and his treatment records do not record any problems.

- Alexander has had a religious conversion.

- He has applied himself to the programs he's taken, though he still has no insight into his own behavior and denies ever being attracted to children.

- Alexander wants to work and stay busy.

### 5. *Dr. Turner's Conclusion*

Based on all of the above, Dr. Turner concluded that Alexander has a behavioral abnormality that makes it likely he will engage in a predatory act of sexual violence. Dr. Turner testified that "behavioral abnormality," as used in the statute, means "a congenital or acquired condition that by affecting a person's emotional or volitional capacity predisposes them to commit sexually violent acts to the extent that they are a menace to the health and safety of others." Dr. Turner explained that the statute does not define the word "likely," but his understanding is that "[i]t means probable or something that's beyond a mere possibility." He denied that he could define the word "likely" in terms of a percentage.

The jury found that Alexander is a sexually violent predator, and the trial court rendered judgment on the verdict. Alexander's motion for new trial was denied by operation of law.

### III. ISSUES PRESENTED

In his first two issues, Alexander argues that the trial court erred in overruling his challenge to Dr. Turner's testimony as unreliable, and that without Dr. Turner's testimony, the evidence is legally insufficient to support the verdict. In his three remaining issues, he contends that even if Dr. Turner's testimony was properly admitted, the evidence still is legally or factually insufficient to support the "behavioral abnormality" element of the State's case.

## IV. ADMISSION OF DR. TURNER'S TESTIMONY

After Alexander testified but before Dr. Turner was called to the witness stand, Alexander moved to exclude Dr. Turner's testimony as unreliable. *See generally Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549 (Tex. 1995); *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992). In a hearing outside of the jury's presence, the trial court overruled the motion. We review the trial court's evidentiary ruling for abuse of discretion, upholding the ruling if there is any legitimate basis for it. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

Under Texas Rule of Evidence 702, a person qualified by knowledge, skill, experience, training, or education may offer an expert opinion if the expert's scientific, technical, or other specialized knowledge will help the factfinder to understand the evidence or to determine a fact issue. TEX. R. EVID. 702. To be admitted, the expert's testimony must be reliable. *Bohannan*, 388 S.W.3d at 305. Faced with a reliability objection, the proponent of the evidence bears the burden to establish that the expert's opinion is reliable. *Guadalupe-Blanco River Auth. v. Kraft*, 77 S.W.3d 805, 807 (Tex. 2002).

For evidence to be reliable, the underlying scientific theory must be valid; the technique applying the theory must be valid; and the technique must have been properly applied on the occasion in question. *Kelly*, 824 S.W.2d at 573. Factors that may affect the reliability determination include (a) the extent to which the theory has been or can be tested; (b) the extent to which the technique relies upon the expert's subjective interpretation; (c) whether the theory has been subjected to peer review or publication; (d) the technique's potential rate of error; (e) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (f) the non-judicial uses which have been made of the theory or

technique. *Robinson*, 923 S.W.2d at 557. This is a non-exhaustive list, and the criteria for assessing reliability can vary, depending on the nature of the evidence. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 727 (Tex. 1998).

Even when the *Robinson* factors are not determinative, "the court must be provided with some way of assessing the reliability of objected-to expert testimony, apart from the expert's credentials and say-so." *Helena Chem. Co. v. Cox*, 664 S.W.3d 66, 74 (Tex. 2023), *cert. denied*, 144 S. Ct. 199 (2023). The reliability of "soft" science evidence, including that offered by a forensic psychologist such as Dr. Turner, may be established by showing that (a) the field of expertise involved is a legitimate one, (b) the subject matter of the expert's testimony is within the scope of that field, and (c) the expert's testimony properly relies upon or utilizes the principles involved in that field. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000) (citing *Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled in part on other grounds by State v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999)).

Dr. Turner has performed 350–400 behavioral-abnormality evaluations and has spoken and written extensively about sex-offender risk assessment. He testified that forensic psychology is a legitimate field; that his testimony is within the scope of that field; and that his expert opinion relies upon the principles of forensic psychology. In forming his opinion that Alexander has a behavioral abnormality as defined in the statute, Dr. Turner followed an approach that he referred to as a "clinically adjusted actuarial approach." He reviewed all of the records that were made available to him, interviewed Alexander for three hours, evaluated empirically-based risk and protective factors, administered and scored the PCL-R, and considered all of the items in the Static-99R.

Alexander maintains that Dr. Turner's testimony is unreliable because Dr. Turner did not score the Static-99R. Dr. Turner explained that the Static-99R is a structured risk scale consisting of "empirically supported actuarial items." An offender's score on this instrument is based on certain risk factors, and among sex offenders with that score, a certain percentage will be convicted or arrested for another sex offense. To illustrate, Dr. Turner stated in a hypothetical that 10% of sex offenders who received a score of 2 on the Static-99R would later be convicted of another sex offense. Dr. Turner admitted that he has previously testified that "the Static-99R is the best tool we have for assessing risk of recidivism," but that when asked in his deposition why he did not score the test, Dr. Turner replied, "Because me and a growing number of colleagues have real concerns about the concept of validity about the Static, meaning it doesn't measure what it says it measures." Dr. Turner testified that he considered all of the factors listed in the Static-99R but stated, "There are some items that I don't give as much weight to, because I think that they indicate how likely someone is to get caught as opposed to how likely someone is to actually re-offend."

We conclude that the trial court did not abuse its discretion in admitting Dr. Turner's testimony, despite his failure to score the test. The Static-99R score is used to identify the percentage risk that the offender will be convicted again for another sex offense but the civil-commitment statute "does not require evidence of a specific percentage of risk." *In re Commitment of Johnson*, No. 05-17-01171-CV, 2019 WL 364475, at *3 (Tex. App.—Dallas Jan. 30, 2019, no pet.) (mem. op.). Moreover, the admission of behavioral-abnormality testimony in a sexually-violent-predator case has been upheld even when the expert has not used the Static-99R—or any other actuarial instrument—at all.

In *In re Commitment of Johnson*, 613 S.W.3d 613, 620 (Tex. App.—San Antonio 2020, pet. denied), Johnson maintained that the trial court abused its discretion in failing to exclude the testimony of Dr. Michael Arambula as unreliable inasmuch as Dr. Arambula did not use statistical data at all. The Fourth Court of Appeals disagreed, pointing out that Dr. Arambula reviewed Johnson's record, interviewed him for two-and-a-half hours, and relied on research showing that offenders who have multiple convictions and who have committed offenses against male victims present an increased risk of reoffending. *Id.* at 620–21. Our sister court further noted that Dr. Arambula "applied techniques consistent with his training, such as relying on the criteria of the Diagnostic and Statistical Manual of Mental Disorders to diagnose Johnson with pedophilia and unspecified personality pathology disorder." *Id.* at 621. The reviewing court concluded that the trial court did not abuse its discretion in admitting Dr. Arambula's testimony. *Id.*

Dr. Turner did all that Dr. Arambula had done, and more. Regarding the Static-99R, Dr. Turner omitted only what the law does not require him to provide, even to establish reliability. On this record, the trial court could reasonably conclude that Dr. Turner properly relied upon or utilized the principles involved in the field of forensic psychology.

We overrule Alexander's first issue. This renders moot Alexander's second issue, in which he argues that the unreliability of Dr. Turner's testimony renders the evidence legally insufficient to support the verdict.

## V. EVIDENTIARY SUFFICIENCY

The determination that a person is a sexually violent predator must be made beyond a reasonable doubt. TEX. HEALTH & SAFETY CODE § 841.062(a). Because this is the same standard of proof required in criminal cases, the legal-sufficiency standard of review mirrors that of criminal cases. *See In re Commitment of Stoddard*,

619 S.W.3d 665, 675 (Tex. 2020) ("*Stoddard II*"). In the legal sufficiency challenge, we measure the evidence against a hypothetically correct jury charge that adequately and accurately describes the elements to be proved. *See Villareal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009). We review the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. *Stoddard II*, 619 S.W.3d at 675 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis omitted in original)).

In a challenge to the factual sufficiency of the evidence, we review the entire record to determine whether a reasonable factfinder could have found beyond a reasonable doubt that the defendant is a sexually violent predator. *Id.* at 668. The evidence is factually insufficient if the undisputed evidence, together with the disputed evidence that no reasonable factfinder could credit in favor of the challenged finding, is so significant when viewed in light of the entire record that the factfinder could not have determined beyond a reasonable doubt that the statutory elements were satisfied. *Id.* at 676.

Whether reviewing for legal or factual sufficiency, and regardless of the burden of proof, the jury remains the sole judge of the witnesses' credibility and the weight to be given to their testimony. *Id.* at 674.

## A.    Legal Sufficiency

In challenging the legal sufficiency of the evidence, Alexander first posits that "the legislatively intended 'behavioral abnormality' definition" was not intended "to apply to an elderly man (like Mr. Alexander), especially one who is not a psychopath, whose risk to reoffend is not more than 'beyond a mere possibility." To reach this result, he asks us to construe "behavioral abnormality" in light of chapter 841's legislative findings and legislative history.

We are bound by both vertical and horizontal stare decisis to decline Alexander's invitation to construe the statute as he suggests.[6] Under the existing legislative definitions of "behavioral abnormality" and "sexually violent predator," the evidence is not rendered legally insufficient by Alexander's age, by the moderate extent of his psychopathic traits, or by Dr. Turner's testimony that Alexander is likely to engage in a predatory act of sexual violence.

### 1. Stare Decisis

We begin with stare decisis because the State's evidence addressed Alexander's likelihood of committing another predatory act of sexual violence, but according to Alexander, this Court has construed the Texas Supreme Court's decision in *Stoddard* to require the State to prove something more than a "likelihood of re-offending." He reasons that the evidence must be legally and factually insufficient under this Court's precedent if the State proved only that Alexander has a "likelihood of re-offending." In addition, he asks us to construe chapter 841 in light of its legislative findings and legislative history to narrow its application.

Alexander seems to have misunderstood this Court's precedent concerning the "likelihood" of reoffending, and we have already rejected his statutory-construction arguments. To understand where his arguments go astray, some context is necessary.

In *Stoddard*, a divided intermediate appellate court construed chapter 841 to require that the defendant "suffer from a behavioral abnormality that renders him a member of the small group of extremely dangerous sex offenders that require civil

---

[6] Vertical stare decisis requires us to follow the precedents of higher courts. *Mitschke v. Borromeo*, 645 S.W.3d 251, 256 (Tex. 2022). Under horizontal stare decisis, we are bound by materially indistinguishable opinions by earlier panels of this Court unless superseded by a higher court, an en banc decision of this Court, or by a legislative or constitutional provision. *Id.*

commitment because they are likely to engage in future predatory acts of sexual violence." *In re Commitment of Stoddard*, 601 S.W.3d 879, 892 (Tex. App.—Fort Worth 2019, pet. granted) (mem. op. on reh'g) ("*Stoddard I*"), *rev'd*, 619 S.W.3d 665 (Tex. 2020). The reference to a "small group of extremely dangerous offenders" is drawn from chapter 841's provision reciting the legislature's findings that caused it to enact a civil-commitment procedure for sexually violent predators. *See* Tex. Health & Safety Code § 841.001. Although the legislative findings form no part of the elements that must be proved in a chapter 841 proceeding, the Second Court of Appeals concluded in *Stoddard I* that it must construe the statute in light of the legislative findings, because to do otherwise "risks ripping Chapter 841 from its constitutional foundation, thus opening the door to civil commitments of sex offenders based solely on their predicate sex offenses." *Id.* at 892–93.

But the Supreme Court of Texas rejected that contention, explaining as follows:

> That concern is unfounded because chapter 841 inherently limits the scope of civil commitment to a limited subset of offenders: those who committed certain enumerated sexually violent offenses, are repeat offenders, and suffer from a behavioral abnormality that makes them likely to engage in a predatory act of sexual violence. In other words, the Act requires evidence of both repeat past sexually violent behavior and a present condition that creates a likelihood of such conduct in the future.

*Stoddard II*, 619 S.W.3d at 678. Thus, the high court rejected the argument that chapter 841's legislative findings or legislative history require courts to construe the statute in a manner that further narrows its application. At the same time, the court emphasized that the statute requires proof of just two elements: (1) the offender has committed certain sexually violent offenses more than once in the past; and (2) the offender has a behavioral abnormality that makes the offender likely to engage in a predatory act of sexual violence in the future.

After the Supreme Court of Texas issued its *Stoddard* opinion, we received a motion for rehearing, a motion for rehearing en banc, and a motion to modify the judgment in *In re Commitment of Ausbie*. *See* No. 14-18-00167-CV, 2021 WL 1972407, at *14 (Tex. App.—Houston [14th Dist.] May 18, 2021, pet. denied) (sub. mem. op. on denial of reh'g). In his motions and supporting brief, Ausbie argued that the "Texas Supreme Court's decision in *Stoddard* could be read to decide that all th[e] 40-word statutory definition of 'behavioral abnormality' means is a 'likelihood' of offending or 'likely' to offend." *Id.* We rejected that argument, and for explanation, we referred Ausbie to the passage in *Stoddard II* quoted above.

Alexander seems to have misunderstood our reasoning in *Ausbie*, for he argues as follows:

> [T]his Court decided in *Ausbie* that [*Stoddard II*] requires the State to prove more than some "likelihood" of sexually reoffending to establish the "behavioral abnormality" element of its case but that the State (and its expert) said in this case that this is all the State has to prove; therefore, the evidence has to be legally insufficient under *Ausbie*.

As far as we can discern, Alexander seems to be arguing that, in *Ausbie*, we interpreted *Stoddard II* to mean that the State must prove that the chance that the defendant will commit a predatory act of sexual violence in the future is something more than a "likelihood." But, in the passage of *Stoddard II* quoted in *Ausbie*, the focus was not on the degree of proof, but on the act to be proved. As *Stoddard II* and *Ausbie* made plain, the State cannot meet its burden with evidence that the defendant has a behavioral abnormality that makes it likely he will commit an offense in future, without regard to the type of offense; rather, the State must prove that the behavioral abnormality makes it likely the defendant will commit another sexually violent offense. To the extent that Alexander suggests otherwise, we reject those arguments.

Alexander makes additional arguments that we rejected in *Ausbie*. The appellant in that case argued that the terms "behavioral abnormality" as defined in chapter 841, and "likely," which is used in the statutory definition of "sexually violent predator,"[7] are ambiguous, and he asked us to construe "behavioral abnormality" in light of chapter 841's legislative findings and legislative history. *Id.* at *11. We declined Ausbie's invitation, pointing out that the Supreme Court of Texas had rejected the argument that the legislature's definition of "behavioral abnormality" is unconstitutionally vague on its face. *Id.* at *11 n.8 (citing *In re Commitment of Fisher*, 164 S.W.3d 637, 655–56 (Tex. 2005)). Moreover, we do not consider the words "likely" or "likelihood" as used in chapter 841 to be ambiguous in light of the explanation by the Supreme Court of Texas that a person is "likely" to commit the requisite act if there is an "increased risk" that the person will do so.[8]

Most recently, we were again asked in *In re Commitment of Weisinger* to construe the "behavioral abnormality" element of chapter 841 in light of the statute's legislative findings and legislative history. *See Weisinger*, No. 14-22-00210-CV, 2023 WL 7498195, at *8 (Tex. App.—Houston [14th Dist.] Nov. 14, 2023, no pet.). Again, we declined. *Id.* at *8–9 (refusing to consider chapter 841's legislative findings and legislative history and collecting cases rejecting similar arguments).

In accordance with the precedents discussed above, we again decline to construe "behavioral abnormality" in light of legislative findings and legislative history.

---

[7] Recall that a person is a "sexually violent predator" if the person (1) "is a repeat sexually violent offender," and (2) "suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." TEX. HEALTH & SAFETY CODE § 841.003(a).

[8] *Bohannan*, 388 S.W.3d at 303.

**2. Age, Degree of Psychopathic Traits, and Likelihood of Future Predatory Acts of Sexual Violence**

Inasmuch as we have refused to construe chapter 841 as Alexander suggests, Alexander's challenges to the legal sufficiency of the evidence rest only on his assertion that the statute does not apply to him because (a) he was 54 at the time of trial, (b) Dr. Turner would not characterize him as a psychopath, and (c) Dr. Turner described the likelihood that Alexander would commit predatory acts of sexual violence as "probable" or "beyond a mere possibility." These factors, whether considered individually or cumulatively, do not render the evidence legally insufficient.

First, Alexander's age does not exempt him from the statute's operation, for "chapter 841 does not mention age, and 'no court has the authority, under the guise of interpreting a statute, to engraft extra-statutory requirements not found in a statute's text.'" *Id.* at \*10 (rejecting same argument from 69-year-old appellant and quoting *PHI, Inc. v. Tex. Juvenile Justice Dep't*, 593 S.W.3d 296, 305 (Tex. 2019)) (cleaned up). There also is no evidence that Alexander's age reduces the likelihood that he will commit another sexually violent offense to a mere possibility. Dr. Turner testified that Alexander's pedophilia is a lifelong, incurable condition. He further explained that the intensity of sexual desires decreases as a person ages and the person's health declines, but as long as a man with pedophilia has a sex drive, he will continue to be attracted to children. There is no evidence that Alexander no longer has a sex drive, and the jury reasonably could draw the contrary inference from the fact that Alexander is engaged to be married.

Second, a PCL-R score below that at which the person would be termed a psychopath does not render the evidence legally insufficient. *See id.* at \*11 (citing *In re Commitment of Hutyra*, No. 14-17-00669-CV, 2018 WL 3911136, at \*6 (Tex. App.—Houston [14th Dist.] Aug. 16, 2018, pet. denied) (mem. op.)). Moreover, Dr.

Turner testified that he attended a PCL-R training session given by the instrument's author, Dr. Robert Hare, and Dr. Hare stated that when scoring the instrument, "instead of having a number where it's cut off, where this person is a psychopath or not a psychopath, it's best to describe it in degrees along a spectrum." Dr. Turner testified that Alexander, with a PCL-R score of 16, has a moderate degree of psychopathic traits; a person with a score of 25–30 would have a high degree of such traits; and a person with a score above 30 would have a severe degree of psychopathic traits. Although Alexander's score is below that at which he would be termed a psychopath, Dr. Turner testified that PCL-R scores generally are not much elevated among pedophilic offenders.

The State offered legally sufficient evidence of Alexander is likely to commit another predatory act of sexual violence. In arguing otherwise, Alexander quotes an example of Dr. Turner referring to the "likelihood of re-offending" rather than the "likelihood of engaging in a predatory act of sexual violence." But in the example he cites, Dr. Turner is answering the question, "What did you see in the records of the assault of [Nancy] that is relevant to your opinion as to whether or not Mr. Alexander suffers from a behavioral abnormality that makes him *likely to engage in a predatory act of sexual violence*?"[9] Dr. Turner explained that Alexander "had already been in legal trouble for a sex offense [against David] and committed another sex offense," and like the first offense, the second offense was against "another prepubescent victim." A sex offense against a child under the age of fourteen constitutes aggravated sexual assault,[10] and by definition, aggravated sexual assault is a "sexually violent offense." TEX. HEALTH & SAFETY CODE § 841.002(8)(A). Without discussing every instance in which Dr. Turner discussed the likelihood that

---

[9] Emphasis added.

[10] *See* TEX. PENAL CODE § 22.021(a)(2)(B).

Alexander would "reoffend," it is clear from the record that Dr. Turner was referring only to the likelihood that Alexander would commit another predatory act of sexual violence, and in particular, an offense against a prepubescent child. The facts previously summarized are legally sufficient to support such a finding.

We overrule Alexander's third and fourth issues.

## B.    Factual Sufficiency

Alexander asserts that the evidence is factually insufficient to support a behavioral-abnormality finding because (1) his age is advancing; (2) according to his score of 16 on the PCL-R, he is not a psychopath; (3) he has had good behavior while imprisoned for over twenty-one years, and (4) he has made progress in his current treatment program for sex offenders.

Again, *Weisinger* offers guidance. In that case, Weisinger argued that the evidence was factually insufficient to support a behavioral-abnormality finding because, among other things, (1) he was 69 years old; (2) he was not a psychopath; (3) he had served over thirty years in prison, so his behavior before prison was not a good predictor of his future behavior; and (4) it was expected he would successfully complete the prison's treatment program for sex offenders. *Weisinger*, 2023 WL 7498195, at *10. We nevertheless found the evidence factually sufficient, and we reach the same result here.

Contrary to Alexander's characterization of himself as "elderly" and of "advanced age," he is only middle-aged, and he is in sufficiently good health that he plans to marry and to work as a warehouseman while attending culinary school. He has only a moderate degree of psychopathic traits, but as Dr. Turner explained, that is not unusual for a pedophilic offender. While his good behavior in prison is commendable and he has applied himself to his treatment and coursework, there is

also evidence that he does not understand why he offended or how to avoid putting himself in a position to offend again. The jury also could infer a lack of progress in treatment from Alexander's trial testimony, for despite admitting that he was aroused when he committed the offenses against David and Nancy, Alexander repeatedly denied that he is now, or ever was, sexually attracted to children. Finally, Dr. Turner considered all of these protective factors, and nevertheless concluded that Alexander is a sexually violent predator. The protective factors are not so significant that the jury could not find, beyond a reasonable doubt, that Alexander is a sexually violent predator.

We overrule Alexander's fifth issue.

## VI. CONCLUSION

We conclude that the trial court did not abuse its discretion in admitting Dr. Turner's testimony, and that the evidence is legally and factually sufficient to support the verdict. We accordingly affirm the trial court's judgment.


/s/     Tracy Christopher
Chief Justice

Panel consists of Chief Justice Christopher and Justices Bourliot and Hassan.